IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RICHARD E. CLARK, JR., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civ. Action No. 07-239-JJF |
| | : |
| WARDEN RAPHAEL WILLIAMS, | : |
| LT. SHEETS, JIM WELCH, and | : |
| DR. PETER BINNION, | : |
| | : |
| Defendants. | : |

Richard E. Clark, Jr., Pro se Plaintiff, Sussex Work Release
Unit, Georgetown, Smyrna, Delaware.

Philip Henry Bangle, Esquire, Deputy Attorney General, Delaware
Department of Justice.  Attorney for Defendants Raphael Williams,
Lt. Sheets, and Jim Welch.

James Edward Drnec, Esquire, Balick & Balick, LLC, Wilmington,
Delaware.  Attorney for Defendant Dr. Peter Binnion.

**MEMORANDUM OPINION**

May  31 , 2009
Wilmington, Delaware

Farnan  District Judge

Presently before the Court are Plaintiff's Motion To Compel;
Dr. Peter Binnion's ("Dr. Binnion") Motion For Summary Judgment
and State Defendants Raphael Williams' ("Warden Williams"),
Patrick Sheets' ("Sheets"), and James Welch's ("Welch")
(collectively "State Defendants") Motion For Summary Judgment,
Plaintiff's Responses, and Defendants' Replies thereto; and Dr.
Binnion's Motion To Strike. (D.I. 120, 141, 160, 176.) For the
reasons discussed below, the Court will grant in part and deny in
part State Defendants' Motion For Summary Judgment, will grant
Dr. Peter Binnion's Motion For Summary Judgment, will deny as
moot Dr. Binnion's Motion To Strike, and will deny Plaintiff's
Motion To Compel.

## I.   **BACKGROUND**

Plaintiff filed his Complaint on May 2, 2007, followed by
several amendments. (D.I. 2, 8, 11, 36.) The original
Defendants were Warden Raphael Williams ("Warden Williams"), Lt.
Sheets ("Sheets"), and Dr. Smith who was later substituted by Jim
Welch ("Welch"). (D.I. 2, 8.) Dr. Lawrence McDonald ("Dr.
McDonald") and Dr. Peter Binnion ("Dr. Binnion") were added as
Defendants on July 31, 2007.[1] (D.I. 11.) Plaintiff alleges that

_____

[1]Dr. Smith and Dr. McDonald were terminated as Defendants on
June 25, 2007, and November 27, 2007, respectively. (D.I. 8,

1

Defendants violated his Eighth Amendment rights when he was incarcerated at the Howard R. Young Correctional Institution ("HRYCI"), Wilmington, Delaware by housing him in a cell with an inmate infected with human immunodeficiency virus ("HIV") and Hepatitis B and in failing to provide him with medical treatment when he contracted Hepatitis B.  Plaintiff was housed at the HRYCI at the time he filed his Complaint.  He is now housed at Sussex Work Release Unit, Georgetown, Delaware.  (D.I. 115.)

Plaintiff began his incarceration with the Delaware Department of Correction in December 2006.[2]  (D.I. 161, ex. C42.) Upon his arrival at the HRYCI, Plaintiff was housed in Pod 2A, Cell 16.  (D.I. 161, ex. A.)  On February 5, 2007, Inmate Anthony Stokes ("Stokes") was transferred to Plaintiff's cell.  (Id. at ex. B.)  Plaintiff, Stokes, and another inmate were housed together.  On March 2, 2007, Plaintiff was transferred from Cell 16 to the 2R Pod.  (Id. at ex. A.)  Plaintiff and Stokes were cellmates for approximately one month.  (Id. at ex. C20.)

Plaintiff testified that during the time he was celled with him, Stokes "was having problems with his skin real bad."  (Id. at ex. C18.)  Plaintiff testified that Stokes was bleeding due to

35.)

[2]Normally an inmate is medically screened upon his arrival at a corrections facility.  The Court was not provided with the medical records for Plaintiff's initial screening.

2

his skin ailment, but "the first couple nights he was in there the bleeding wasn't as bad." (Id. at ex. C21.) Stokes informed Plaintiff that he was infected with HIV and Hepatitis B. (Id. at ex. C26.) Plaintiff believes that he contracted Hepatitis B from Stokes because of Stokes' severe skin condition at the time he entered the cell, Stokes scratched constantly, blood was all over Stokes' shirt and sheets, and scabs were all over the cell. (D.I. 161, ex. C18.) During the time they were cellmates, spots of blood were on the floor and toilet seat twelve to thirteen times. (Id. at ex. C23-24.) Plaintiff had contact with the blood when he voluntarily cleaned up Stokes' blood, his soiled clothing, and sheets. (Id. at ex. C24-25.)

Warden Williams and Sheets state that they had no knowledge of Stokes' medical condition. (Id. at ex. D Sheets Interrog No. 3; Williams Interrog No. 3.) On February 9, 2007, Plaintiff wrote a letter to Sheets complaining that his new cellmate, Stokes had "full blown AIDS[3] and Hepatitis B" and that Stokes had open bleeding lesions. (D.I. 48, ex. A; D.I. 161, ex. C28.) Plaintiff also spoke to Sheets about the situation, but nothing was done. (D.I. 161, ex. C10, C12, C23.)

_____

[3]Acquired immunodeficiency syndrome.

3

Plaintiff wrote a similar letter to Warden Williams on February 12, 2007, complaining of Stokes' condition of open bleeding lesions combined with AIDS and Hepatitis B.[4]  (D.I. 48, ex. A.; D.I. 161, ex. C33.)  He did not receive a response to the letter.  (D.I. 161, ex. C33.)  Plaintiff placed the letters in the in-house mail, but he does not know if Sheets and Williams received the letters.  (D.I. 161, ex. C29; C33.)  However, neither Sheets, nor Williams recall receiving a letter from Plaintiff.[5]  (Id. at ex. D. Response to Sheets Interrog. No. 3; Response to Williams Interrog. No. 3.)  Plaintiff testified that approximately one week after mailing his letter to Sheets, he spoke to him regarding the issue of his cellmate's bleeding in the cell.  (Id. at ex. C29.)  Sheets did not recall this conversation.  (Id. at ex. D Response to Sheets Interrog. No. 4.)  When Plaintiff spoke to Sheets, there was no blood in the cell.  (Id. at ex. C24.)  Plaintiff did not show Warden Williams, Welch, or Sheets the blood in his cell.  (Id. at ex. C24.)

_____

[4]Plaintiff testified that he wrote to Warden Williams on February 9, 2007, but the copy of his letter to the Warden is dated February 12, 2007.  (D.I. 161, ex. C33.)

[5]The record contains a memorandum from Warden Williams on June 20, 2007, regarding Plaintiff's "Recent Correspondence." (D.I. 48, ex. D.)  It is unknown if the letter is in response to Plaintiff's February 12, 2007 letter to Warden Williams.  The body of the letter states, "The health care unit and mailroom supervisor have been alerted to your allegations."  (Id.)

Medical records indicate that Plaintiff's blood was drawn on March 23, 2007. (D.I. 143, ex. A1.) When Dr. Binnion became aware of the results he noted on March 28, 2007, that Plaintiff needed to be seen "ASAP because of jaundiced hepatitis." (Id. at ex. A2.) Physician orders on the same date state, "enroll in CCC (i.e., chronic care clinic)" and see Monday, April 2."[6] (Id. at ex. A3.) Dr. Binnion enrolled Plaintiff in the chronic care clinic with the expectation that he would be followed by Dr. McDonald. (D.I. 142, ex. D.) Dr. Binnion ordered additional lab tests, and they were performed on March 29, 2007. ((D.I. 143, ex. A3, A4.)

Plaintiff saw Dr. Binnion on March 28, 2007. His chronic disease clinic notes of the same date state that Plaintiff presented to the clinic at his request due to a routine blood test that indicated elevated bilirubin levels. (Id. at ex. A5.) The assessment was jaundice and hepatitis, probably A, with follow-up in five days and hepatitis profile testing. (Id.)

Plaintiff returned to Dr. Binnion on April 3, 2007. (Id. at ex. A6.) A baseline medical data form states that Plaintiff had onset of Hepatitis B symptoms on March 7, 2007. (Id. at ex. A7.) Dr. Binnion diagnosed acute hepatitis and jaundice. (Id. at ex.

---

[6]Plaintiff was not seen that day due to security. (D.I. 143, ex. A2.)

A8.)  Additional information states that Plaintiff entered the HRYCI on January 2, 2007, that Plaintiff acquired Hepatitis B before this, and that he is recovering from Hepatitis B.  (Id. at ex. A9.)  Physician's orders dated April 3, 2007, state, "repeat lab in 10 days - return to CCC within two weeks."  (Id. at ex. A10.)

On April 3, 2007, the day he was diagnosed with Hepatitis B, Plaintiff submitted a grievance (No. 108163) complaining that he had written Sheets and Williams regarding his cellmate but no action was taken to address the issue that he had been housed with an inmate who was infected with Hepatitis B and bleeding in the cell.  (D.I. 48, ex. B; D.I. 161, ex. G.)  On April 24, 2007, Plaintiff was advised that the grievance was "not grievable" because the action requested was inappropriate or not completed and there must be an actual request, such as a request for an investigation.  (D.I. 48, ex. B.)  He submitted a second grievance on April 4, 2007 (No. 108403) complaining that he was not receiving appropriate treatment for his Hepatitis B condition.  (D.I. 48, ex. C.)  In the meantime, Plaintiff submitted a third grievance on July 15, 2007, with the same complaint that he was not receiving appropriate medical treatment.  (Id.)  The grievance was combined with No. 108403.  Both grievances were denied on September 6, 2007, noting that

6

Plaintiff was receiving medical treatment. (Id.) The denial
notes that Plaintiff "wishes to appeal." (Id.)

Plaintiff testified that he sent Welch a letter on June 10,
2007, complaining that he was not receiving proper medical
treatment for his Hepatitis B condition. (D.I. 161, at ex. C15.)
A copy of the letter is found at D.I. 48, ex. A. Welch, however,
does not have a record that he received this letter. (Id. at ex.
H ¶ 2.)

As ordered by Dr. Binnion, blood testing was performed on
April 23, 2007. (D.I. 143, ex. A10.) Plaintiff did not return
to see Dr. Binnion until December 3, 2007. (D.I. 143, ex. A24.)
His condition, however, continued to be monitored. He was seen
by Dr. Ellis Kendle ("Dr. Kendle") on June 6, 2007, for
complaints of lower back pain, and he returned to Dr. Kendle on
July 9, 2007. (D.I. 143, ex. A2, A12.) At that time, Plaintiff
provided his history and stated that he "has 'Hepatitis B' how he
got it, he doesn't know." (Id.) On July 18,2 007, Dr. Kendle
ordered blood tests. (Id. at ex. A14.) Plaintiff was seen by
Dr. Kendle the next day, for his lower back condition and again
on July 24, 2007 for his Hepatitis B condition.[7] (Id. at ex.

---

[7]Plaintiff submitted medical grievances on July 21 and 23,
2007, complaining that he needed to see Dr. Kendle because he was
not receiving pain medication ordered by Dr. Kendle. (D.I. 143,
ex. A15, A16.)

A13, A18.) At that time, Plaintiff complained that he had not yet had his blood drawn as ordered on July 18, 2007, and he had yet to see Dr. McDonald. (Id. at ex. A18.) Dr. Kendle compared March and April lab results and noted improvement. (Id.) On July 24, 2007, Dr. Kendle referred Plaintiff to Dr. McDonald regarding his Hepatitis B condition. (Id. at ex. A14, A18.)

Plaintiff returned to medical on July 28, 2007. (Id. at ex. A18.) The progress notes indicate that Plaintiff tested positive for Hepatitis B, but negative for Hepatitis A and C. (Id.) On the same date, Plaintiff was educated on the disease process, modes of transmission and plan of care. (Id.) Additionally, an order was written for Plaintiff to begin the Hepatitis A vaccine series, and the series was completed.[8] (Id. at ex. A20.) Blood analysis conducted on July 31, 2007, showed improved results. (Id. at ex. A21A, A21B.)

Plaintiff was seen in medical on August 6, 2007 with sore throat complaints, and on August 8, 2007, he saw Dr. McDonald regarding his Hepatitis B condition. (Id. at ex. A19.) Dr. McDonald found Plaintiff improved and stable. (Id.) Plaintiff testified that Dr. McDonald indicated that "it looked like" Plaintiff contracted Hepatitis B in February 2007. (D.I. 161,

---

[8]Plaintiff is vaccinated against Hepatitis A and has not contracted the disease. (D.I. 161, ex. C96.)

8

ex. C58-61.)  On August 21, 2007, blood was drawn to measure the
hepatitis viral load, with abnormal (i.e., high) results.  (D.I.
143, ex. A21B.)

Plaintiff returned to medical on September 7, 2007, with
numerous complaints, and was next seen by Dr. McDonald for his
Hepatitis B condition on October 31, 2007.  (Id. at ex. A21,
A22.)  He ordered new blood work and noted that Plaintiff was to
return within thirty days.  (Id. at ex. A22-23.)

Plaintiff presented to Dr. Binnion on December 3, 2007.
(Id.)  His progress note states that he had not seen Plaintiff
since the diagnosis of Hepatitis B; that Plaintiff was "over" the
Hepatitis B in August 2007; and that Plaintiff's liver enzyme
levels were normal.[9]  (Id. at ex. A25.)  Dr. Binnion released
Plaintiff to return to work, except for food handling.  (Id. at
ex. A26.)

Following the December 3d examination by Dr. Binnion,
Plaintiff's condition was monitored by medical personnel.  He was
seen by physicians, lab work conducted, and dietary supplements
ordered on December 20, 27 and 28, 2007; January 4, 10, 17, 24,

_____

[9]Dr. Binnion explained that he meant that Plaintiff's enzyme
levels were so low that the Hepatitis B was not detectible.
(D.I. 142, ex. C.)  Plaintiff testified that he thought Dr.
Binnion meant he no longer had Hepatitis B, and that Nurse
Practitioner Binkley corrected his misunderstanding.  (D.I. 161,
ex. C145.)

and 29; February 18 and 28; March 14, 18, 19 and 27; and April 7, 8, 9, 20, 24, and 28; May 1, 6, 8, 12, 13, 16, 17, 19, 23, 27, and 30; June 4, 13, 14, 19, 23. (D.I. 143, ex. A27-36, A41, A44-49, A51-A55.) Plaintiff's viral load was tested on April 18, 2008, and the results were below the limits of detection (ie., less than 2000 copies/mL) for the method used. (Id. at ex. A42.) On April 7, 2008, Dr. McDonald submitted a consultation request for a liver biopsy, it was approved and took place on May 12, 2008. (Id. at ex. A37.) Most areas of the liver biopsy were within normal limits, although there was a focal slight fibrosis and chronic inflammation. (D.I. 170, ex. A.) Plaintiff continues to receive regular chronic care treatment for his medical conditions. (D.I. 143, ex. A56-A94.)

According to Dr. Binnion, acute Hepatitis B does not typically require any acute treatment. (D.I. 142, ex. C.) He states that Hepatitis B is not typically addressed with affirmative treatment such as medication. (D.I. 142, ex. D.) It is his professional judgment that Plaintiff does not now require, and during the time he was involved with Plaintiff, did not require, any treatment for his Hepatitis B. (Id.) Dr. Binnion did not order a blood test because he did not believe it is a useful tool "until the hepatitis has either resolved or the HLT's continue at a high level." (D.I. 142, ex. E ¶ 5.)

According to Dr. McDonald, at no time between April 2, 2007 and December 17, 2008, were Plaintiff's liver functions compromised to the point that he required any treatment. (D.I. 142, ex. C.) He opines that the failure to perform blood tests between April 23, 2007, and July 29, 2007, did not have a negative impact upon Plaintiff's health, and that the failure to provide a Hepatitis A vaccine prior to July 30, 2007 did not harm Plaintiff. (Id.) As of March 27, 2008, Plaintiff's liver functions were within normal range, and his functions continued to be in the normal range. (D.I. 142, exs. C, D.)

## II. STANDARD OF LAW

The Court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).

When determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable

inferences in that party's favor.  <u>Wishkin v. Potter</u>, 476 F.3d
180, 184 (3d Cir. 2007).  "Facts that could alter the outcome are
'material,' and disputes are 'genuine' if evidence exists from
which a rational person could conclude that the position of the
person with the burden of proof on the disputed issue is
correct."  <u>Horowitz v. Federal Kemper Life Assurance Co.</u>, 57 F.3d
300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material
fact, the nonmoving party then "must come forward with 'specific
facts showing that there is a genuine issue for trial.'"
<u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587 (quoting Fed. R.
Civ. P. 56(e)).  If the nonmoving party fails to make a
sufficient showing on an essential element of its case with
respect to which it has the burden of proof, the moving party is
entitled to judgment as a matter of law.  <u>See</u> <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 322 (1986).

Dr. Binnion moves for summary judgment on the grounds that
Plaintiff's condition was not a serious medical need and he was
not deliberately indifferent to Plaintiff's medical condition.
(D.I. 142.)  State Defendants move for summary judgment on the
grounds that they are entitled to Eleventh Amendment immunity for
the claims raised against them in their official capacities,
Plaintiff failed to exhaust his administrative remedies,

12

Plaintiff cannot prove that he was housed under unconstitutional
conditions of confinement, and Defendants are entitled to
qualified immunity.

## III.  DISCUSSION

### A.  Eleventh Amendment

State Defendants are sued in their individual and official
capacities.  Plaintiff seeks compensatory damages and injunctive
relief in the form of medical care.

"[O]fficials acting in their official capacities are [not]
'persons' under § 1983."  Will v. Michigan Dep't of State Police,
491 U.S. 58, 71 & n.10 (1989).  Hence, Plaintiff's claims
against State Defendants in their official capacities are
considered to be against the State itself and are barred by the
Eleventh Amendment.  However, suits for injunctive relief against
state officials brought to end ongoing violations of federal law
are not barred by the Eleventh Amendment.  Ex Parte Young, 209
U.S. 123 (1908); See also Frew v. Hawkins, 540 U.S. 431, 437
(2004); MCI Telecomm. Corp. v. Bell Atlantic-Pennsylvania, 271
F.3d 491, 506 (3d Cir. 2001); see also Idaho v. Coeur d'Alene
Tribe of Idaho, 521 U.S. 261, 288 (1997) ("The Young doctrine
recognizes that if a state official violates federal law, he is
stripped of his official or representative character and may be

personally liable for his conduct; the State cannot cloak the officer in its sovereign immunity.").

The Eleventh Amendment, therefore, does not preclude Plaintiff from pursuing his claims against the State Defendants for prospective injunctive relief. The record indicates that at the time Plaintiff filed this suit, he was housed at the HRYCI. He is no longer housed there, having been transferred to the Sussex Work Release Center. An inmate's transfer or release from the facility complained of generally moots equitable and declaratory claims. Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003); See Weaver v. Wilcox, 650 F.2d 22, 27 n.13 (3d Cir. 1981) (stating that prisoner's transfer from the prison moots claim for injunctive and declaratory relief with respect to prison conditions but not claim for damages). Inasmuch as Plaintiff is no longer housed at the HRYCI, his claim for prospective injunctive is moot. Accordingly, the Court will grant the State Defendants' Motion For Summary Judgment on the issue of Eleventh Amendment immunity.

**B. Administrative Remedies**

State Defendants Warden Williams and Sheets contend they are entitled to summary judgment because Plaintiff failed to exhaust the administrative remedies available to him prior to filing his

14

lawsuit. Plaintiff responds that he submitted a grievance on the issue, but it was returned as "non-grievable."

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see Porter v. Nussle, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Failure to exhaust administrative remedies must be pled and proved by the defendant. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." Booth v. Churner, 532 U.S. 731, 741 n.6 (2001). Exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." Woodford v. Ngo, 548 U.S. 81, 88 (2006). "'[P]rison grievance procedures supply the yardstick' for determining what steps are

15

required for exhaustion." Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007) (quoting Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004)).

As long as there is a shared factual basis between the two, perfect overlap between the grievance and a complaint is not required by the PLRA. Jackson v. Ivans, 244 F. App'x 508, 513 (3d Cir. 2007 (citing Woodford, 548 U.S. at 95 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance."). The PLRA does not require the grievance and complaint to be identical because inmates are required to complete the applicable administrative process (such as a grievance procedure) even when seeking a form of relief that the prison cannot provide, so long as the prison can afford some sort of relief. See Booth v. Churner, 532 U.S. 731 (2001).

A prisoner must complete the administrative review process in accordance with the applicable procedural rules in order to satisfy the exhaustion requirement of the PLRA. Nickens v. Department of Corr., 277 F. App'x 148, 152 (3d Cir. 2008) (citing Williams, 482 F.3d at 639; Spruill, 372 F.3d at 228, 231.) Delaware Department of Correction ("DOC") administrative procedures provide for a multi-tiered grievance and appeal process. DOC Policy 4.4 (revised May 15, 1998). First, within

seven days following the incident, the prisoner must submit a grievance which is forwarded to the Inmate Grievance Chair for an attempt at informal resolution; second, if unresolved, the grievance is forwarded to the Grievance Resolution Committee for a determination, which is forwarded in turn to the Warden; and third, the Bureau Grievance Officer conducts the final level of review.  Id.

State Defendants contend there is no evidence that Plaintiff grieved the issue that he was housed with an inmate with infectious diseases, that he only filed grievances once he was diagnosed with Hepatitis B and this did not afford prison officials the time and opportunity to address the issues raised in the complaint.  The record reflects that on April 3, 2007, the day he was diagnosed with Hepatitis B, Plaintiff submitted a grievance complaining of a February 3, 2007 incident when no action was taken by Sheets and Warden Williams after Plaintiff complained about his cellmate who had an infectious disease and bleeding lesions.  Plaintiff requested apologies from the staff for not answering or acknowledging the severity of the situation.  Plaintiff was advised on April 24, 2007, that the grievance was "not grievable" because the action requested was inappropriate or not completed.

17

The grievance was not returned as untimely even though the grievance form provides for the returning of a grievance on that ground. Rather, it appears the grievance was returned as "not grievable" based upon the remedy sought by Plaintiff, an apology. Moreover, Plaintiff was not required to submit a grievance with issues identical to those raised in the Complaint. It is evident there is a shared factual basis between the issue raised in the Complaint against Warden Williams and Sheets (i.e., they did not act when Plaintiff informed them he was celled with an infectious inmate) and the issue raised in the grievance (i.e., Warden Williams and Sheets took no action to fix or address the problem of Plaintiff's cellmate who had an infectious disease and bleeding lesions).

Because the grievance was "not grievable, Plaintiff had no administrative remedy. Therefore, the exhaustion requirement need not be met. For the foregoing reasons, the Court will deny State Defendants' Motion For Summary Judgment on the issue of exhaustion of administrative remedies.

## C. Conditions Of Confinement

Plaintiff alleges that Sheets and Warden Williams violated his constitutional rights when he told them of the housing situation with Stokes, but nothing was done. (D.I. 161, ex. C12, C17.) More particularly, Plaintiff alleges that Defendant prison

18

officials unnecessarily exposed him to Hepatitis B and caused him to contract the virus, in violation of his Eighth Amendment rights. State Defendants move for summary judgment on the grounds that Plaintiff has no affirmative evidence that his cellmate had Hepatitis B and was bleeding in the cell, that State Defendants were aware of the condition, and were knowingly and intentionally indifferent to Plaintiff's health and safety.

A condition of confinement violates the Eighth Amendment only if it is so reprehensible as to be deemed inhumane under contemporary standards or such that it deprives an inmate of minimal civilized measure of the necessities of life. See Hudson v. McMillian, 503 U.S. 1, 8 (1992); Wilson v. Seiter, 501 U.S. 294, 298 (1991). When an Eighth Amendment claim is brought against a prison official it must meet two requirements: (1) the deprivation alleged must be, objectively, sufficiently serious; and (2) the prison official must have been deliberately indifferent to the inmate's health or safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Deliberate indifference is a subjective standard in that the prison official must actually have known or been aware of the excessive risk to inmate safety. Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001).

A prisoner may state a cause of action under the Eighth Amendment when he alleges that prison officials have, with

19

deliberate indifference, exposed him to a serious, communicable disease that poses an unreasonable risk of serious damage to the prisoner's future health. Helling v. McKinney, 509 U.S. 25, 33-35 (1993). See also Glick v. Henderson, 855 F.2d 536, 539-40 (8th Cir. 1988) (finding that a prisoner could state a § 1983 claim by demonstrating "a pervasive risk of harm to inmates of contracting" a communicable disease and "failure of prison officials to reasonably respond to that risk") (internal quotations omitted).

The record reflects Stokes was triple-celled with Plaintiff and another inmate. They were cellmates for approximately one month, and Stokes, who had bleeding sores also had Hepatitis B. The Hepatitis B virus is known to be transmitted to humans only by direct exposure to infectious body fluids including blood, vaginal or seminal fluid contact, or from mother to fetus. Crocamo v. Hudson County Corr. Ctr., Civ. No. 06-1441 PGS, 2007 WL 1175753, at *7 (D.N.J. 2007).

Plaintiff meets the first prong of the two-part test, as he was housed with an inmate with serious contagious diseases and exposed to a communicable disease, which posed an unreasonable risk of serious damage to his future health. See Id. at 33-35. See also Glick v. Henderson, 855 F.2d 536, 539-40 (8th Cir. 1988). State Defendants argue, however, that Plaintiff does not

have any evidence that his cellmate was infected with Hepatitis B, and bleeding in their shared cell. Of course, Plaintiff bears the ultimate burden of proof on this issue. Yet, as State Defendants know, at the summary judgment stage, the Court views the evidence in the light most favorable to the nonmoving party, here Plaintiff, and draws all reasonable inferences in his favor.

Plaintiff testified that Stokes informed him that he was infected with Hepatitis B. State Defendants provided nothing to refute Plaintiff's testimony.[10] Moreover, Plaintiff testified that Stokes was bleeding in the cell. Again, State Defendants did not refute Plaintiff's testimony but argue that he did not show the blood to State Defendants. State Defendants also argue that Plaintiff was not ordered to clean any blood in the cell. Regardless, Plaintiff testified there was blood in the cell, that he cleaned the area and, therefore, was exposed to the Stokes' blood.

---

[10]Plaintiff proceeds pro se and has no access to another inmate's medical records and, unless housed in the same area, no access to Stokes to enable him to obtain an affidavit from Stokes. Additionally, the Court notes inmates are not allowed to correspond with other inmates, eliminating another option for Plaintiff to obtain an affidavit from Stokes. If, in fact, Stokes is not infected with Hepatitis B, it seems that State Defendants have the means available to them to obtain evidence to support this position.

State Defendants argue that the evidence does not support
Plaintiff's position that he only could have acquired Hepatitis B
from Stokes.  To support their position, State Defendants
contend that Plaintiff "confessed" that he acquired Hepatitis B
before entering the HRYCI.  The medical note, referred to by
State Defendants and prepared by Dr. Binnion, is dated March 28,
2007, and is found in a chronic disease follow-up form.  It
states that Plaintiff entered the HRYCI on January 2, 2007, and
that "Hepatitis B was acquired before this."  Dr. Binnion's note
does not indicate where he obtained the information; for example,
if the information was history provided by Plaintiff or if it is
Dr. Binnion's opinion.  Notably, there is no reference that
Plaintiff "confessed" he tested positive for Hepatitis B prior to
his incarceration at the HRYCI.[11]  State Defendants also refer to
a second progress note dated July 9, 2007, when Plaintiff
provided history and indicated that he did not know how he
acquired Hepatitis B.  State Defendants omit reference to
Plaintiff's testimony that Dr. McDonald indicated it appeared
Plaintiff had contracted Hepatitis B in February 2007.  This is
during the time-period Plaintiff was housed with Stokes.

---

[11]The Court was not supplied with Plaintiff's medical
records prior to his incarceration in December 2006; nor was it
supplied with medical screening records upon his incarceration.

As to the second prong of the two-part test, there remain genuine issues of fact whether Warden Williams and Sheets were deliberately indifferent to Plaintiff's health or safety. Plaintiff testified that he wrote to both Warden Williams and Sheets and that he also spoke to Sheets, about Stokes' medical conditions and bleeding lesions, but neither took any action.[12] The record contains copies of the letters. Plaintiff testified that he placed them in the prison mail.[13] Plaintiff also testified in detail about his conversation with Sheets. Conversely, Warden Williams and Sheets state that there is no record or evidence that either actually received the letters, Sheets does not recall the conversation with Plaintiff, Plaintiff admits that he does not know if Warden Williams and Sheets received his letters, and he admits that he did not show the blood in his cell to either Defendant.

---

[12]State Defendants did not explain what, or if, there is a policy for housing inmates with Hepatitis B.

[13]Plaintiff testified that he placed the letters in the in-house mail. While he did not know if the letters were received, he testified that "pretty much when you sent out in-house mail they always receive it." (D.I. 161, ex. C29.) The Court takes notice, by analogy, of the common-law mailbox rule that if a document is properly mailed, it is presumed the United States Postal Service delivered the document to the addressee in the usual time. Philadelphia Marine Trade Association-International Longshoremen's Ass'n Pension Fund v. C.I.R., 523 F.3d 140, 147 (3d Cir. 2008).

As it now stands, it is far from clear whether Warden
Williams and Sheets were aware that Plaintiff was living under
conditions that exposed him to a communicable disease that posed
an unreasonable risk of serious harm to his future health, and
whether they were knowingly and intentionally deliberately
indifferent to that risk. What is clear is that there remain
genuine issues of material fact on the issue. For the above
reasons, the court will deny State Defendants' Motion For Summary
Judgment as to Warden Williams and Sheets.

## D. Qualified Immunity

State Defendants Warden Williams and Sheets argue that the
facts do not demonstrate that Plaintiff's constitutional rights
were violated or that they were clearly established and,
therefore, they are entitled to qualified immunity.[14]

Qualified immunity operates "to ensure that before they are
subjected to suit, officers are on notice their conduct is
unlawful." Saucier v. Katz, 533 U.S. 194, 206 (2001). Qualified
immunity protects officers' action or inaction in the course of
performing their duties, but that protection is forfeited when an
officer's conduct violates "clearly established statutory or

---

[14]The Court will not address qualified immunity as to Welch.
As will be discussed later in this Memorandum Opinion, his Motion
For Summary Judgment will be granted on the grounds that he was
not deliberately indifferent to Plaintiff's serious medical
needs.

24

constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The question whether a right was clearly established at the time of the alleged violation and the question whether the officer acted reasonably are matters of law for the court to decide. See Bartholomew v. Pennsylvania, 221 F.3d 425, 428 (3d Cir. 2000).

The two-step test as set forth in Saucier v. Katz, 533 U.S. 194 (2001), is not mandatory, but often appropriate when analyzing qualified immunity. Pearson v. Callahan, -U.S.-, 129 S.Ct. 808, 818 (2009). Under the Saucier protocol, first, the Court examines whether or not the alleged conduct, taken in the light most favorable to Plaintiff, violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id. If the allegations amount to the violation of a constitutional right, the Court proceeds to the second inquiry and determine if the right was "clearly established in the specific context of the case." See Brosseau v. Haugen, 543 U.S. 194, 198 (2004); Saucier, 533 U.S. at 202 (noting that an officer is entitled to qualified immunity unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted"). Courts now have the discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Pearson, 129 S.Ct. at 818.

In the case at bar there remain genuine issues of disputed material fact as to whether Warden Williams and Sheets violated Plaintiff's constitutional rights, and therefore, said determination remains a question for a jury trial. Accordingly, the Court will deny Warden Williams' and Sheets' Motion For Summary Judgment on the issue of qualified immunity.[15]

## E. Medical Needs

Welch is named as a defendant because Plaintiff notified him on June 10, 2007, "what was going on with medical." (D.I. 161, ex. C15.) Plaintiff alleges that he contacted Welch regarding the lack of treatment for his Hepatitis B condition because Welch, as the medical services administrator, oversees medical. (D.I. 161, ex. C37.)

---

[15]State Defendants argue that Plaintiff's rights were not clearly established. This position disregards Helling v. McKinney, 509 U.S. 25, 33-35 (1993) (a prisoner may state a cause of action under the Eighth Amendment by alleging that prison officials have, with deliberate indifference, exposed him to a serious, communicable disease that poses an unreasonable risk of serious damage to the prisoner's future health).

Plaintiff alleges that Dr. Binnion violated his
constitutional rights when he (1) failed to timely order and
monitor blood work between April 23 and July 29, 2007; (2) failed
to refer Plaintiff to the chronic care clinic to see infectious
disease specialist Dr. McDonald; (3) failed to provide him with a
vaccine against Hepatitis A; (4) failed to educate him on the
disease; and (5) lied to him on December 3, 2007, when he told
Plaintiff he was "over the hep C in August." (D.I. 161, ex.
A92.)

The government has an "obligation to provide medical care
for those whom it is punishing by incarceration." Estelle v.
Gamble, 429 U.S. 97, 104 (1976). For Plaintiff to establish an
Eighth Amendment violation, he must establish that Defendants
acted with deliberate indifference to his serious medical needs.
Id. Deliberate indifference may be manifested by "intentionally
denying or delaying access to medical care or intentionally
interfering with the treatment once prescribed ." Estelle, 429
U.S. at 104-05. Mere negligence does not violate the Eighth
Amendment. Id. at 106. Additionally, "mere disagreement as to
the proper medical treatment" is insufficient to establish an
Eighth Amendment violation. Monmouth County Corr. Institutional
Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) (citations
omitted). The Third Circuit has specifically found deliberate

27

indifference when: (1) a prison official knows of the prisoner's need for treatment but intentionally refuses to provide it; (2) the prison official delays necessary medical treatment for non-medical reasons; or (3) the prison official prevents a prisoner from receiving needed or recommended treatment. Rouse v. Plaintier, 182 F.3d 192, 197 (3d Cir. 1999) (citations omitted).

The record reflects that when Plaintiff wrote to Welch, Plaintiff's medical condition was being monitored and he was receiving treatment. Based upon the record before the Court, a reasonable jury could not find that Welch was deliberately indifferent to Plaintiff's medical needs. Therefore, the Court will grant Welch's Motion For Summary Judgment.

With regard to Dr. Binnion, the record reflects that Plaintiff saw him on three occasions: March 28, April 3, and December 3, 2007, and other medical personnel saw him numerous times during 2007. Plaintiff argues that Dr. Binnion's failure to timely order and monitor blood work between April 23 and July 29, 2007 violated his constitutional rights. Based upon the record, the Court cannot say this was deliberate indifference. According to Dr. McDonald, at no time between April 2, 2007 and December 17, 2008, were Plaintiff's liver functions compromised to the point that he required any treatment. Moreover, it is undisputed that the failure to perform blood tests between April

23, 2007 and July 29, 2007 did not have a negative impact upon
Plaintiff's health.  At the most, the lack of blood work between
April and June 2007 may demonstrate negligence on the part of Dr.
Binnion.  Negligence, however, does not rise to the level of a
constitutional violation.

    Further, contrary to Plaintiff's assertions, Dr. Binnion did
not ignore Plaintiff's concerns, but referred him to the chronic
care clinic.  It is unknown why Plaintiff did not receive an
appointment sooner than he did.  Regardless, the referral was
made.  Similarly, Plaintiff's argument that Dr. Binnion failed to
provide him with a vaccine against Hepatitis A is unavailing.
The record reflects that he was ultimately received the vaccine
and has not contracted Hepatitis A.  Additionally, it is
undisputed that the failure to provide Plaintiff a Hepatitis A
vaccine prior to July 30, 2007 did not harm him.

    The record also reflects that Plaintiff received information
and education about Hepatitis B.  Finally, Plaintiff's claim that
Dr. Binnion lied to him on December 3, 2007, when he told
Plaintiff he was "over the hep B in August" does not rise to the
level of a constitutional violation.  Plaintiff has not shown a
genuine issue for trial and summary judgment on Dr. Binnion's

behalf is proper.   Therefore, the Court will grant his Motion For
Summary Judgment.[16]

## IV.   MOTION TO COMPEL

On December 1, 2008, Plaintiff filed a Motion To Compel
Production of Documents.   (D.I. 120)   The Motion states that
Plaintiff served discovery upon Defendants in October 2008 and
that a reminder was sent to Defendants on November 9, 2008.   The
Court Docket does not reflect these filings.

Dr. Binnion responds that although he was unable to locate
Plaintiff's filings, he provided the requested information to
Plaintiff on December 11, 2008.   (D.I. 124.)   Plaintiff agrees
the Motion as to Dr. Binnion is moot.   (D.I. 128.)

State Defendants respond that they are unaware of the
discovery requests to which Plaintiff refer and that they have
produced to Plaintiff over one hundred fifty pages of documents
and responded to Plaintiff's discovery requests.   (D.I. 146.)
The Court docket does not support Plaintiff's position that he
served discovery upon State Defendants or that they failed to
respond.   Therefore, the Court will deny the Motion To Compel as
to the State Defendants.

_____

[16]The Court will deny as moot, Dr. Binnion's Motion To
Strike Plaintiff's Reply.   (D.I. 176.)

## V.  CONCLUSION

For the above reasons, the Court will grant in part and deny in part State Defendants' Motion For Summary Judgment and will grant Dr. Binnion's Motion For Summary Judgment.  (D.I. 141, 174.)  The Court will deny as moot Dr. Binnion's Motion to Strike and will deny Plaintiff's Motion to Compel.  (D.I. 120, 176.)

An appropriate Order will be entered.